IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| Adam Josephs,<br><br>       Plaintiff,<br>vs.<br><br>Amentum Services, Inc., URS Federal Services International, Inc., DynCorp International LLC, Dallas Aviation, Inc., TD Supply Specialists, LLC, and Freedom Air Industries, Inc.,<br><br>       Defendants. | CIVIL ACTION NO. _____<br><br>**COMPLAINT**<br>**False Claims Act, 31 U.S.C. 3729 et seq.**<br><br>**JURY TRIAL DEMANDED**<br><br><u>**UNDER SEAL**</u> |

I. **INTRODUCTION**

1. This is an action brought under the False Claims Act ("the FCA" or "the Act"), 31 U.S.C. § 3729, et seq., by Relator Adam Josephs, on behalf of the United States Government, to recover civil penalties and damages arising from Defendants' scheme to submit false claims to the United States Government.

2. This action arises from false claims for payment and false statements made by Defendants in connection with Air Force Civil Augmentation Program ("AFCAP") contracts. As alleged more fully below, Defendants knowingly engaged in a range of anticompetitive conduct, creating a pretense of a fair and independent price competition, while ensuring the Government would pay more than it would through genuine competition. This conduct—including sharing bid pricing among subcontractors, colluding with a subcontractor to serve as a "broker" and "reseller", and using "complementary bids" to justify awarded bids—inflates the amounts paid by the Government and violates the contracts as well as applicable statutes and regulations.

## II.  JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to the FCA, 31 U.S.C. §§ 3729 and 3730.

4. This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C § 1391(b) and 31 U.S.C § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States.

5. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because one or more of the Defendant can be found in, transacts, or has transacted business in this District.

## III.  PARTIES

### A.  Relator

6. Relator Adam Josephs owns and operates a clothing distribution company. Amentum (as defined below) subcontracted Relator's company in 2021 to supply clothing in support of the Afghan refugee program. In his dealings with Amentum and its other subcontractors, Relator observed anticompetitive conduct among Amentum and its subcontractors.

7. There has been no public disclosure within the meaning of § 3730(e)(4)(A) of the allegations Relator is asserting. In addition, Relator is an original source under § 3730(e)(4)(B) because (i) prior to any purported public disclosure, Relator voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, and/or (ii) Relator has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and has voluntarily provided the information to the Government before filing an action under this section.

**B.     Defendants**

8.      Defendant Amentum Services, Inc. ("Amentum Services") is incorporated under the laws of Delaware with its principal place of business in Chantilly, Virginia. The company provides services such as environmental management, training, logistics, consulting, systems engineering and IT to customers in 28 countries. A vast majority of Amentum's business is with the United States Defense and Energy departments.

9.      Amentum Services was created on January 31, 2020, when infrastructure consulting firm AECOM sold its Management Services business to affiliates of Lindsay Goldberg and American Securities LLC. The purchasers created the new entity, Defendant Amentum Services, Inc.

10.     Defendant URS Federal Services International, Inc. ("URS") provides engineering, program management, consultancy, technical assistance, construction management, and closure services worldwide. URS was publicly traded (NYSE: URS) from January 13, 1978, through its acquisition by AECOM on October 17, 2014. After the acquisition, URS became a subsidiary of AECOM. When AECOM sold its management services business in 2020, URS became a subsidiary of the newly created Amentum Services.

11.     Defendant DynCorp International LLC ("DynCorp") is a private military contractor organized under the laws of Delaware with its principal place of business in McLean, Virginia. Under the DynCorp name, it provided aviation, logistics, training, intelligence and operational solutions in over 30 countries worldwide. On November 23, 2020, Amentum Services acquired DynCorp. On April 21, 2021, the DynCorp name was discontinued, and employees and services were transferred to Amentum Services.

12.     Amentum Services, URS and DynCorp collectively will be referred to as "Amentum."

13. Defendant Dallas Aviation, Inc. ("Dallas Aviation") is incorporated under the laws of Texas with its principal place of business in Arlington, Texas. The company's line of business includes the wholesale distribution of transportation equipment and supplies. Dallas Aviation is a subcontractor of Amentum.

14. Defendant Freedom Air Industries, Inc. ("Freedom Air") is incorporated under the laws of Florida with its principal place of business in Doral, Florida. The company provides aviation material support, vehicle and ground support, logistic and industrial support. Freedom Air is a subcontractor of Amentum.

15. Defendant TD Supply Specialists, LLC ("TD Supply') is organized under the laws of Wisconsin with its principal place of business in Neenah, Wisconsin. The company sources and supplies job sites across the U.S. with industrial and tool needs. TD Supply is a subcontractor of Amentum.

## IV.   FACTUAL ALLEGATIONS

### A.   The AFCAP Contracts and Applicable Requirements

16. The Air Force Contract Augmentation Program (AFCAP) is a rapid response contingency contract tool for use by U.S. Government entities needing urgent assistance.

17. On April 6, 2020, the Government awarded contracts under AFCAP V for contingency planning, deploying and training/equipping of forces, emergency and contingency construction, and logistics/commodities and services. The total AFCAP V contract award exceeds $6 billion.

18. Under AFCAP V, prime contract FA 8051-20-D-0001 was awarded to URS and prime contract FA 8051-20-D-0002 was awarded to DynCorp. As noted above, Defendant Amentum Services, Inc. is the parent company of both of these entities. Both prime contracts are so-called indefinite-delivery/indefinite-quantity ("IDIQ") contracts. Relator's subcontracts were

4

under delivery order FA-8051-21F-0058; that delivery order is currently valued at approximately $970 million.

19.     The relevant prime contracts under AFCAP V (FA-8051-20-D-0001 and 0002), are cost type contracts with no predetermined award fee. Instead, the award fee is effectively an overhead and profit factor applied to the total dollars paid out under the contracts. Under this framework, higher contract costs ultimately inure to Amentum's financial benefit.

20.     As Government contracts, the prime contracts are subject to the Federal Acquisition Regulations ("FAR"). *See* 48 C.F.R. § 225.7301(b). In addition, they are subject to the Defense Federal Acquisition Regulation Supplement ("DFARS"), which provides Department of Defense ("DoD") specific regulations that supplement the standard federal contracting rules found in the FAR.

21.     As the Government has made clear in section 3.301 of the Federal Acquisition Regulations applicable to AFCAP V and the relevant contracts:

> Practices that eliminate competition or restrain trade usually lead to excessive prices and may warrant criminal, civil, or administrative action against the participants. Examples of anticompetitive practices are collusive bidding, follow-the-leader pricing, rotated low bids, collusive price estimating systems, and sharing of the business.

22.     Accordingly, Government contracts typically contain a standard provision for bidders to certify that their bids have been arrived at independently. *See, e.g.*, 48 CFR § 3.103-1 and 48 C.F.R. § 52.204-8(c)(1)(i); *see also* FAR 52.203-2, Certificate of Independent Price Determination.

23.     As part of Amentum's supplier onboarding process, Relator was provided with The Amentum Group Purchase Order Terms and Conditions – Commercial Items (Purchase Order) used for purchases from subcontractors, which required the following:

2780889.4

> All supplies or services performed or furnished under this Order will also include the Buyer's Government prime contracts number and incorporate the required terms and conditions of the Government prime contracts (if applicable) that will be incorporated into the Order or other written direction by Buyer. Seller agrees to flow down, as required, all applicable clauses of the Government prime contracts terms and conditions.

24.     Further, the Standard Terms of the Amentum Group purchase order required a Certification of Independent Price Determination. Every subcontractor selling items to the Amentum Group must certify:

> [t]hat the price(s) proposed have been arrived at independently, without consultation, communication, or agreement with any others for the purpose of restricting competition, and that Seller has not and will not knowingly disclose the price(s), directly or indirectly, to any third party.

25.     These Terms and Conditions and Standard Terms are consistent with the requirements that applicable statutes, regulations, and contracts establish for Amentum and its subcontractors to ensure genuine competition and prevent collusive processes which inflate costs for the Government.

26.     Defendants are also subject to Federal Acquisition Regulations § 31.201-2, which makes a cost allowable only if it is reasonable, allocable to the contract, and consistent with the contract and "practices appropriate to the circumstances."

27.     Defendants' performance of the contract is also subject to compliance with the Sherman Antitrust Act, which prohibits any agreement among competitors to fix prices, rig bids, or engage in other anticompetitive activity. 15 U.S.C. § 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."); *see also* 15 U.S.C. § 15a (authorizing suit by the United States for antitrust injury).

2780889.4

### B. Amentum's Anticompetitive Conduct

28. Relator owns and operates a clothing distribution company that performed as a subcontractor for Amentum on the relevant contracts. Relator's company ultimately supplied approximately $3.4 million in clothing to Amentum from October 2021 through January 2022.

29. While performing his company's subcontract, Relator personally observed and documented anticompetitive conduct by Amentum and its subcontractors.

30. A VP-level employee in the Amentum's procurement department first approached Relator in September 2021 to quote on supplying clothing for AFCAP V, in support of the Afghan refugee program.

31. On September 27, 2021, Relator sent the VP-level employee in Amentum's procurement department a price quote for certain requested clothing items (the "September 27 Amentum Price Quote"). Due to the large quantities of clothing items that Amentum was seeking for the Afghan refugee program, there was insufficient stock available in any single brand or style to meet the quantities requested. Therefore, rather than having to quote numerous specific styles (e.g., Gildan G184B youth sweatpants, Jerzees 973B youth sweatpants, etc.) which may or may not have been available when orders would eventually be submitted, Relator's company used generic item numbers for categories of clothing (e.g., "S2002Y" for youth sweatpants) that could be fulfilled in an assortment of brands and styles to meet the required quantities. Nearly all of the generic item numbers on the September 27 Amentum Price Quote were newly devised for Amentum and had not been provided to any other party.

32. Relator's company received its first purchase order from Amentum on October 20, 2021 and ultimately received, and fulfilled, 16 purchase orders Amentum submitted through December 23, 2021, for a total of approximately $3.4 million.

2780889.4

33. In the weeks following Relator's sending Amentum the September 27 Amentum Price Quote, Relator began receiving unsolicited requests for price quotes from various companies he had never heard of. These companies requested items using Amentum-specific item numbers, even though those numbers had not been shared with any other company but Amentum.

34. The first of these requests came to Relator from Defendant TD Supply on October 7, 2021. After further inquiry and correspondence, TD Supply made clear that its request was prompted by Amentum. When Relator stated he would need Amentum's permission to quote to TD Supply on account of Amentum's purported policies prohibiting price discussions between subcontractors, TD Supply assured Relator that Amentum had no objection to the interactions between TD Supply and Relator's company. Upon further inquiry from Relator, on October 21, 2021, TD Supply emailed Relator attaching a copy of the document it had received from Amentum: the September 27 Amentum Price Quote that Relator had sent only to the VP-level employee in Amentum's procurement department.

35. Shortly thereafter, on October 29, 2021, Defendant Dallas Aviation sent an unsolicited email to Relator requesting a quote for adult and youth rain jackets using the Amentum-specific item numbers that Relator had newly devised for Amentum and had not provided to any other party.

36. Dallas Aviation followed up by email and phone on November 2, 2021. During the phone call, Dallas Aviation confirmed that it had received Relator's price quote from Amentum and revealed other anticompetitive conduct of Dallas Aviation and Amentum: (1) that Dallas Aviation serves as a "broker" and "reseller" for Amentum for a variety of items (including, for example, toilet paper) unrelated to Dallas Aviation's primary business of

2780889.4

transportation equipment and supplies, an arrangement whereby Dallas Aviation purchases goods from Amentum's subcontractors or potential subcontractors and resells them to Amentum with a markup, and (2) Amentum sometimes needs Dallas Aviation to submit a "higher bid" so that Amentum can justify the bid it ultimately awards another subcontractor.

37.    On November 4, 2021, after Relator notified Dallas Aviation via email that he would need Amentum's permission to quote to Dallas Aviation on account of Amentum's purported policies prohibiting price discussions between subcontractors, the President of Dallas Aviation forwarded Relator's email to a senior purchasing manager in Amentum's procurement department (who reports directly to the VP-level employee with whom Relator had been in contact) requesting that Amentum grant Relator permission to sell to Dallas Aviation at the specific price Relator had quoted to Amentum. The Amentum senior purchasing manager then forwarded Dallas Aviation's request email to Relator, with a note directly granting that permission and referring to Dallas Aviation as one of its "partners." Amentum's communication with Dallas Aviation and subsequent direction to Relator demonstrates its coordination with its subcontractor (Dallas Aviation) about the exact prices another subcontractor (Relator's company) would charge Dallas Aviation for items that Dallas Aviation would resell to Amentum with an upcharge—items that Amentum was also purchasing directly from Relator's company.

38.    Specifically, Relator's company supplied approximately 2,000 units of an item (item #S778YDP, youth rain jackets) to Amentum for $32.79 each, and at approximately the same time sold 800 units of the same item to Dallas Aviation for $34.99 each. Dallas Aviation then resold the youth rain jackets to Amentum with an unknown upcharge, meaning Amentum paid more to Dallas Aviation for the exact same item it purchased from Relator's company.

39. This so-called "stacking" of subcontractors, whereby purchases from other subcontractors or potential subcontractors are filtered through a middleman subcontractor, substantially increases the costs for the purchaser, here, the United States Government.

40. On November 15, 2021, Relator received an unsolicited call from a third entity, Defendant Freedom Air, requesting a quote on clothing items Relator's company had already been supplying to Amentum. On November 24, 2021, Freedom Air submitted an unsolicited purchase order to Relator via email. The purchase order requested that the items be shipped directly to Amentum Services at the same delivery address and with the same receiving contact as the purchase orders Relator's company itself had fulfilled for Amentum. Freedom Air used the same pricing for the purchase order as in the September 27 Amentum Price Quote, and when informed the pricing had increased since then, Freedom Air canceled the purchase order. On December 10, 2021, Relator received another call from Freedom Air in which it requested a quote on yet another clothing item Relator's company had already been supplying to Amentum. Upon Relator's inquiry regarding how Freedom Air would possibly be able to submit a competitive bid when it was basing its quote on purchasing from a direct seller to Amentum (Relator's company), Freedom Air indicated it would go on to submit a bid that it knew would be too high but that Amentum likes when it does so regardless.

41. Both Dallas Aviation and Freedom Air told Relator of their intention to submit bids to Amentum that were higher than what they knew Relator's company would or had bid, and referenced that Amentum needs or wants the subcontractors to submit these token bids even though they would not be awarded.

42. These so-called "complementary bids" help Amentum by providing the appearance of genuine competition to justify the prices of its awarded bids and create a false

2780889.4

impression that Amentum was seeking the most favorable prices for the Government (when in actuality it was not, and instead profited from higher contract costs). Indeed, even when purchasing millions of dollars of clothing from Relator's company, Amentum did not attempt to negotiate pricing or discounts or make counteroffers on his company's pricing at all, except on one occasion for one single type of clothing comprising less than 2% of Amentum's purchases from Relator's company.

### C. Notice to Amentum's Management

43. Relator put Amentum's management on notice the above-described subcontractor contact was occurring. Specifically, when Relator first received a request from TD Supply to quote items that appeared to be for Amentum, Relator directly emailed the VP-level employee in Amentum's procurement department with whom he had been in contact (copying a senior buyer at Amentum) to notify Amentum of the contact from TD Supply and confirm Relator's company was permitted to quote TD Supply pricing given Amentum's purported policies prohibiting price discussions between subcontractors. The VP-level Amentum employee received the email and responded that he was not aware of another supplier being given guidance to contact Relator's company.

44. Yet, even after Relator specifically notified both the VP-level employee and the senior buyer in Amentum's procurement department of the ongoing impropriety, the illegal bid rigging conduct continued with Amentum's approval, as discussed in detail above. For example, when the senior purchasing manager in Amentum's procurement department (who reports directly to the VP-level employee) was asked via email by the President of Dallas Aviation whether Amentum would approve Relator's company quoting Dallas Aviation the same price it had quoted Amentum for the same item (to be resold by Dallas Aviation to Amentum), she forwarded the request to Relator and gave Amentum's written consent.

### D. Scope of Amentum's Misconduct

45. Relator's communications with both Amentum and its subcontractors indicate that this misconduct was recurrent and widespread, extending to a broad range of purchases related to the AFCAP V prime contracts.

46. When a representative of TD Supply sought a quote from Relator based on the item and price list received from Amentum, and Relator said he would need Amentum's permission due to their purported policies prohibiting price discussions between subcontractors, she responded: "*They send it out to people like myself to quote for them. I can tell you that it will be ok for you to quote me.*" This email reflects that Amentum's price sharing is a common practice, i.e., that there are "*people like [her]self*" she knows receive the pricing, and that Amentum is aware of and approves the practice.

47. Likewise, on Relator's November 2, 2021 call with Dallas Aviation, Dallas Aviation made clear that Amentum uses Dallas Aviation as a "broker" and "reseller" for numerous items, "stuff like toilet paper, and just everything you can think of." This suggests their collusive conduct of Amentum and Dallas Aviation extends far beyond clothing procurement.

48. On the same call, the Dallas Aviation representative stated to Relator matter-of-factly that Amentum had emailed Dallas Aviation a request for quote for two items and had simply attached the Relator's quote to the email. Indeed, the arrangement between Amentum and Dallas Aviation was so common and familiar that Amentum could send Dallas Aviation a request for quote and attach another subcontractor's price quote with no explanation or context, and Dallas Aviation understood how to proceed.

49. The Dallas Aviation representative described an overly close and familiar relationship with Amentum that is consistent with collusive conduct rather than professional and arm's length dealing.

### E. Defendants' False Claims Act Violations

50. Sharing of pricing among subcontractors is expressly prohibited in Amentum's supplier terms, Title 48 of the United States Code of Federal Regulations (FAR), Department of Defense Federal Acquisition Regulation Supplement (DFAR) and the Sherman Antitrust Act.

51. Price sharing is akin to bid rigging and, at minimum, renders the bidding process a sham. A bidder that receives the competitor pricing information, to the extent it wants to "win" the award, knows the exact price it needs to match or nominally beat to become the low bidder—it has no incentive to bid as low as it can.

52. Similarly, as discussed with regard to the Dallas Aviation and Freedom Air conduct, price sharing provides a guidepost for the recipient bidders to submit "complementary bids" to help Amentum justify the prices it pays, which in turn results in higher prices to the Government.

53. Amentum's price sharing also facilitates its subcontractor "stacking"—colluding with subcontractors (like Dallas Aviation) to serve as a "broker" and "reseller" through which Amentum purchases items with a markup rather than purchasing directly at lower prices—inflating costs to the Government.

54. Through these various avenues, Defendants' conduct creates a pretense of fair and independent price competition while at the same time guaranteeing that Amentum, and ultimately the Government, is paying more than it would through legitimate competition.

55. In order to receive payment from the United Slates Government for services pursuant to Government contracts, Defendants knowingly made, prepared or caused to be made

or prepared false statements and false claims for payment or approval, and knowingly presented or caused them to be presented to an officer or employee of the United States Government in order to obtain approval and payment from the Government.

56. Defendants' records and claims for payment were false or fraudulent because, individually and collectively, Defendants falsely and improperly did not disclose to the United States Government common arrangements to discuss and affect prices under contracts awarded by the United States Government (or subcontracts thereto).

57. Defendants' records and claims for payment were false or fraudulent because Defendants falsely represented, directly or indirectly, that they had not engaged in common discussions or agreements regarding prices to be offered.

58. Defendants' actions to knowingly mischarge on their contract and subcontract agreements violated the terms of contracts between Defendants and the United States Government, including Defendants' independent price determination certifications described above, as well as their certifications that pricing proposals to the Government were reasonable, allocable to the contract, and consistent with the contract and "practices appropriate to the circumstances."

59. In seeking payment from the Government, Defendants falsely certified that the payments requested were in accordance with contract terms and rules when in fact they were not.

60. The requests for payment submitted by Defendants pursuant to the Government contract were false claims.

61. Defendants' false claims and false statements were material, in that they had a natural tendency to influence, and/or were capable of influencing, the United States' payment

decision. Had the Government known of Defendants' misconduct, it would not have paid claims submitted by Defendants, or would have paid substantially less.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### FALSE CLAIMS ACT, 31 U.S.C. § 3729
### AGAINST ALL DEFENDANTS

62.     Relators re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

63.     This is a civil action brought by Relator, on behalf of the United States of America, against Defendants under the False Claims Act, 31 U.S.C. § 3730(b)(1).

64.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval to the Government, in violation of 31 U.S.C. § 3729(a)(1)(A).

65.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records and/or statements material to false or fraudulent claims to the Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

66.     Defendants, conspired to defraud the Government by getting a false or fraudulent claim allowed or paid, in violation of 31 U.S.C. § 3729(a)(1)(C).

67.     The United States, unaware of the falsity of the claims and/or statements made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for false or fraudulent claims.

2780889.4

68. As a result of Defendants' actions as set forth above, the United States has been, and may continue to be, severely damaged.

## VI. PRAYER FOR RELIEF

69. WHEREFORE, Relator, on behalf of the United States, demands and prays that judgment be entered in favor of the United States and against Defendants, jointly and severally, as follows:

(1) Defendants pay an amount equal to each and every false or fraudulent claim or retention of funds, multiplied as provided for in 31 U.S.C. § 3729(a)(1), plus a civil penalty of not less than $5,000 or more than $11,000 per claim or violation as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990;

(2) Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 et seq.;

(3) The United States and Relator be granted all costs, pre- and post-judgment interest and all such further relief as the Court deems just and proper.

(4) Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d); and

(5) Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d).

## VII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a jury trial for all claims and issues so triable.

2780889.4

Dated: May 2, 2023

Respectfully submitted,

**MOORE LANDREY, L.L.P.**

By: /s/ Greg M. Dykeman
Greg M. Dykeman (TX Bar No. 06325100)

905 Orleans Street
Beaumont, Texas 77701
Telephone: (409) 835-3891 Ext. 126
gdykeman@moorelandrey.com

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Nimish R. Desai (TX Bar No. 24105238)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
ndesai@lchb.com

**BERG & ANDROPHY**
David Berg (TX Bar No. 02187000)
3704 Travis Street
Houston, Texas 77002
Telephone: (713) 529-5622
Facsimile: (713) 529-3785
dberg@bafirm.com

2780889.4