IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **ADAM JOSEPHS** | * | |
| | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | Civil Case No.: SAG-25-01477 |
| **v.** | * | |
| | * | |
| **AMENTUM SERVICES INC.,** *et al.* | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Adam Josephs ("Plaintiff") brings this action pursuant to the False Claims Act ("FCA") against Amentum Services, Inc.; URS Federal Services International, Inc.; DynCorp International LLC; Dallas Aviation, Inc.; TD Supply Specialists, LLC; and Freedom Air Industries, Inc (collectively, "Defendants"). ECF 63. Amentum, URS, and DynCorp jointly filed a motion to strike, or in the alternative, to dismiss Plaintiff's amended complaint. ECF 66. Dallas Aviation also filed a motion to strike, or in the alternative, to dismiss. ECF 71. TD Supply and Freedom Air each filed a motion to dismiss. ECF 67, 70. Plaintiff opposed these motions, ECF 77, and also filed a cross-motion for an extension of time to file his amended complaint *nunc pro tunc*, ECF 76. Amentum, URS, and DynCorp then jointly filed a reply and opposition to the cross-motion. ECF 80. Because some Defendants raised a challenge in their motions to the constitutionality of the *qui tam* provisions of the FCA, the United States intervened as of right under 28 U.S.C. § 2403(a) for the limited purpose of defending the constitutionality of those provisions and opposing the motions on that basis. ECF 68, 69. Amentum, URS, and DynCorp jointly filed a reply on the constitutional question. ECF 72. The Anti-Fraud Coalition then filed a

motion for leave to file an amicus brief, ECF 78, which Amentum, URS, and DynCorp jointly opposed, ECF 81.

This Court has reviewed the filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons explained below, this Court will (1) grant The Anti-Fraud Coalition's motion; (2) deny Plaintiff's cross-motion; (3) grant TD Supply's and Freedom Air's motions; (4) grant Amentum's, URS's, and DynCorp's motion as to DynCorp and the price sharing and bid rigging allegations but deny it as to Amentum and URS and the subcontract stacking allegations; and (5) grant Dallas Aviation's motion as to the price sharing and bid rigging allegations but deny it as to the subcontract stacking allegations.

## I.    BACKGROUND

The following facts are derived from Plaintiff's amended complaint, ECF 63, and are assumed to be true for purposes of these motions.

Amentum is a company that provides commercial services, primarily to the United States Department of Defense. *Id.* at ¶ 17. DynCorp and URS are subsidiaries of Amentum. *Id.* at ¶¶ 19–20. In 2018, the Air Force requested bids under the Air Force Contract Augmentation Program V ("AFCAP V"). *Id.* at ¶ 80. The request specified that several Federal Acquisition Regulations pertinent here would apply to the contract: (1) FAR 52.203-13, (2) FAR 52.203-7, (3) FAR 52.244-5, and (4) DFARS 252.215-7010. *Id.* In 2020, URS was awarded Contract FA 8051-20-D-0001 ("URS AFCAP V Contract") under AFCAP V, and DynCorp was awarded Contract FA 8051-20-D-0002 under AFCAP V. *Id.* at ¶ 81.

Following its withdrawal from Afghanistan, the United States launched Operation Allies Welcome to assist Afghan evacuees. *Id.* at ¶ 83. As part of that operation, the Department of Defense awarded URS a task order pursuant to the URS AFCAP V Contract to supply the

government with, as pertinent here, clothing items for evacuees. *Id.* at ¶¶ 84–85. The task order was a cost-plus-fixed-fee contract, which provides for payment to the contractor of a fixed fee as well as allowable costs, or costs that are reasonable and comply with the terms of the contract. *Id.* at ¶¶ 86–89.

Plaintiff owns and operates a clothing distribution company, Suppliest Co. LLC. *Id.* at ¶ 15. Shortly after URS was awarded the task order, a representative from Amentum whose sender name as it appeared alongside his email address included "(Amentum-DynCorp)" contacted Suppliest about quotes for winter clothing items. *Id.* at ¶¶ 95, 98 n.3. Plaintiff ultimately provided the representative with an index of the quoted prices for various items, denoted by unique item codes. *Id.* at ¶¶ 98–100. Nearly all of the item codes were newly devised for Amentum, and Suppliest had not provided them to any other party. *Id.* at ¶ 101. Another Amentum representative then sent Plaintiff a request for a formal bid, and the request identified itself as coming from DynCorp. *Id.* at ¶ 102. Suppliest submitted a bid, and Amentum sent Suppliest for execution its standard subcontractor agreement for commercial items, which specified that the subcontract was in support of the URS AFCAP V Contract, as well as a document listing the "AVCAP 5 Prime Contract Flow Downs," which stated that FAR 52.203-7 and FAR 52.203-12 were applicable to all subcontracts. *Id.* at ¶¶ 104–109, 114–15. The subcontractor agreement also required Suppliest to certify that it would not disclose its prices to any third party. *Id.* at ¶ 109.

Amentum ultimately selected Suppliest to supply clothing to it through sixteen different purchase orders pursuant to the URS AFCAP V Contract. *Id.* at ¶ 117. Each purchase order noted that it was subject to the URS AFCAP V Contract flow downs, and Plaintiff alleges that on information and belief, all Amentum purchase orders pursuant to that contract contained that language. *Id.* at ¶ 118.

Shortly after Suppliest had shared its price index with Amentum, Plaintiff received an email from a representative of TD Supply, a supplier of industrial tools and equipment, requesting quotes for clothing items using the unique item codes that Suppliest had created for the index shared with Amentum. *Id.* at ¶¶ 24, 123. Plaintiff had never had any prior contact with TD Supply. *Id.* at ¶ 123. The email also inquired about shipping costs to the same zip code used by Amentum. *Id.* After Plaintiff responded that he had to check with Amentum before sending quotes to TD Supply, given the prohibition in the subcontractor agreement on disclosing prices, the TD Supply representative stated that Amentum had shared the Suppliest price index with TD Supply. *Id.* at ¶¶ 125–27.

Plaintiff soon thereafter received a similar email from a representative of Dallas Aviation, a company that provides aircraft supplies and services, requesting quotes for winter coats and raincoats using the unique item codes from the price index shared with Amentum. *Id.* at ¶¶ 22, 130. Plaintiff had never had any prior contact with Dallas Aviation. *Id.* at ¶ 130. The representative later told Plaintiff that Amentum had shared the price index with Dallas Aviation and had directed Dallas Aviation to send the email requesting the quotes for the coats. *Id.* at ¶¶ 143–44. When Plaintiff inquired why Amentum would share the price index and engage an intermediary to supply items that it was already purchasing directly from Suppliest, the representative responded that this conduct was common practice, explaining that Amentum regularly uses Dallas Aviation as a purported "broker" and "reseller" for items, such as toilet paper, that are unrelated to Dallas Aviation's primary business of aviation supplies and services. *Id.* at ¶ 145. She also stated that Amentum often directs Dallas Aviation to provide a quote so that Amentum can purport to have received an appropriate number of independent and competitive bids and that Dallas Aviation often provides quotes with "higher pricing" so that

Amentum can justify the bid awarded to another subcontractor. *Id.* at ¶ 146. She relayed that Suppliest might still receive a direct order because its bid would be the lowest, given it would not have Dallas Aviation's "markup on it." *Id.* at ¶¶ 147–48. She described this process as "weird." *Id.* at ¶ 148.

Plaintiff informed the representative that he would need permission from Amentum to provide the quotes. *Id.* at ¶ 150. The President of Dallas Aviation then emailed a senior purchasing manager at Amentum requesting that Amentum provide Suppliest with permission, and the senior purchasing manager then emailed Plaintiff, granting permission on behalf of Amentum to sell to Dallas Aviation at the referenced prices and explained that Dallas Aviation is one of Amentum's "partners." *Id.* at ¶¶ 150–51. After receiving that email, Suppliest sold Dallas Aviation a quantity of youth raincoats, and Dallas Aviation resold them to Amentum at a higher price. *Id.* at ¶ 152. That same month, Suppliest sold a quantity of the same youth raincoats to Amentum directly at a lower price. *Id.*

Plaintiff also received a call that month from a representative of Freedom Air, an aircraft maintenance company, requesting quotes for various types of clothing that Suppliest had already been supplying to Amentum. *Id.* at ¶¶ 23, 131. Plaintiff had never had any prior contact with Freedom Air. *Id.* at ¶ 131. The representative told Plaintiff that Amentum had shared Suppliest's pricing information with Freedom Air and that Amentum was the end customer. *Id.* Plaintiff informed the representative that Suppliest had updated its pricing since it had created the price index, and the representative responded that Freedom Air would take a loss if it purchased at the updated pricing. *Id.* at ¶ 132. Freedom Air then sent Suppliest a purchase order for those items and requested that they be shipped to Amentum's shipping address, but it cancelled the order

after Plaintiff reiterated that the pricing listed in the purchase order was outdated. *Id.* at ¶¶ 133–34.

The following month, Amentum requested a quote from Suppliest for 11,000 beanies. *Id.* at ¶ 153. Minutes after Suppliest received this request, it received a call from a representative of Freedom Air requesting a quote for 11,000 beanies with Amentum as the end customer. *Id.* When Plaintiff asked how Freedom Air could compete with a bid from Suppliest when it would have to purchase the items from Suppliest and then resell them to Amentum, the representative explained that Freedom Air could not compete and would instead submit a bid that it knew would be too high, because Amentum liked Freedom Air to place high uncompetitive bids even if it did not intend to be awarded the contract. *Id.*

Plaintiff lists several subcontracts awarded to Dallas Aviation, Freedom Air, and TD Supply pursuant to the URS AFCAP V Contract. *Id.* at ¶ 136. Plaintiff also alleges that on information and belief, Amentum routinely submitted invoices or vouchers to the government to receive reimbursement for its costs incurred to make purchases under the URS AFCAP V Contract, and the government routinely paid them as presented. *Id.* at ¶ 119.

Plaintiff alleges that Defendants' conduct constitutes anticompetitive price sharing, bid rigging, and subcontract stacking. *Id.* at ¶ 4. Subcontract stacking occurs when layered contracts through an intermediary artificially increase costs and conceal markups. *Id.* at ¶ 46. Plaintiff cites to one case in which the government intervened, and later settled, involving subcontract stacking. *Id.* at ¶ 56. In that case, Dell Technologies Inc. and Dell Federal Systems L.P. allegedly agreed with Iron Bow Technologies LLC that Dell would sell computer products to Iron Bow at "advantageous" prices so that Iron Bow could sell those products to the Army, and Dell submitted a high direct bid to the Army to ensure Iron Bow won the contract. *Id.* at ¶¶ 57–58.

The Army awarded the contract to Iron Bow, which then awarded the subcontract to Dell, thereby stacking the contracts and artificially inflating the costs of the products sold to the Army. *Id.* at ¶ 58.

## II.    LEGAL STANDARDS

Federal Rule of Civil Procedure 15 permits a plaintiff to amend its pleading once as of right within twenty-one days of service of a motion to dismiss. Fed. R. Civ. P. 15(1)(b). A party seeking to amend its pleading after twenty-one days following service may do so "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). However, the Rule requires courts to "freely give leave when justice so requires." *Id.* The Fourth Circuit's policy is "to liberally allow amendment." *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010). Accordingly, leave to amend should be denied only if "prejudice, bad faith, or futility" is present. *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509–10 (4th Cir. 1986). Ultimately, the decision to grant leave to amend rests in this Court's discretion. *Foman v. Davis*, 371 U.S. 178, 182 (1962). As the Fourth Circuit has stated, a proposed amendment is futile when it "is clearly insufficient or frivolous on its face." *Johnson*, 785 F.2d at 510.

A defendant is permitted to test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations

omitted); *Houck v. Substitute Tr. Servs.*, *Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). To allege fraud, "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally," however. *Id.* Claims arising under the FCA are claims based on fraud, so they must satisfy the heightened pleading standard under Rule 9(b). *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 196 (4th Cir. 2018).

## III. DISCUSSION

### A. Motion for Leave to File Amicus Brief

This Court will grant The Anti-Fraud Coalition's motion for leave to file an amicus brief. Amicus briefs must be filed no later than seven days after the filing of the principal brief of the party being supported. Loc. R. 105.12(e) (D. Md. 2025). Plaintiff filed his principal brief on August 29, 2025, ECF 77, and The Anti-Fraud Coalition filed its motion, with its proposed brief attached, seven days later on September 5, 2025, ECF 78. Thus, the motion was timely filed. Although Amentum, URS, and DynCorp counter that Plaintiff merely adopted the constitutional arguments contained in the government's brief, which was filed a month earlier, the amicus brief is styled as in support of Plaintiff. *See* ECF 78. Moreover, even though Amentum, URS, and DynCorp argue that they would have responded to The Anti-Fraud Coalition's arguments when they responded to the government's arguments had the amicus brief been filed seven days after the government's brief, they responded to The Anti-Fraud Coalition's arguments in their opposition to the motion for leave to file the amicus brief. Amentum, URS, and DynCorp have therefore suffered no prejudice.

### B. Timeliness of Amended Complaint

Defendants first argue that the amended complaint must be stricken because it was untimely. As noted above, Plaintiff had twenty-one days following service of a motion to dismiss to file an amended complaint as of right. The first motion to dismiss his original complaint was filed on May 29, 2025, ECF 46, but Plaintiff filed his amended complaint, without Defendants' consent or this Court's leave, more than twenty-one days later on June 26, 2025, ECF 63. Although Plaintiff argues that this Court's order setting a June 26, 2025 deadline for him to "respond" to motions to dismiss, ECF 41, could reasonably be interpreted to extend the deadline to amend as of right to that date, this Court is not persuaded that an unrelated scheduling order could have such effect. Rule 15 therefore did not permit Plaintiff to file his amended complaint.

Plaintiff alternatively cross-moves for a seven-day extension *nunc pro tunc* to cure the untimeliness, but has offered no reasons, and this Court perceives none, why such relief would be warranted. This Court therefore must deny Plaintiff's cross-motion.

This Court is not persuaded, however, that striking the complaint at this point would serve any purpose other than needless delay. If Plaintiff had properly styled his amended complaint as a motion for leave to file an amended complaint, this Court would have had to apply the Fourth Circuit's policy to liberally allow amendment absent prejudice, bad faith, or futility. Now that Plaintiff, each Defendant, the government, and an amicus have all filed briefing regarding the merits of the amended complaint, this Court perceives no reason to strike the amended complaint and require all parties to file what would likely be nearly identical briefing in response to a motion for leave to file an amended complaint. Accordingly, although this Court does not condone the improper filing of the amended complaint, in the interests of judicial economy, it will deny

Defendants' motions to strike the amended complaint as untimely and will address their alternative motions to dismiss it on the merits.

## C. FCA

Turning now to the merits, this Court first considers DynCorp's contention that the claims against it must be dismissed because Plaintiff has failed to allege sufficient conduct by it with particularity. Plaintiff does not respond to this argument. Although it appears that some of the initial communication from Amentum to Suppliest may have come through individuals affiliated with DynCorp, the complaint otherwise does not allege any involvement by DynCorp or its representatives, and it appears that all of the subcontracts pertinent to this case that Amentum awarded were awarded under the URS AFCAP V Contract, rather than the AFCAP V contract that was awarded to DynCorp. Accordingly, this Court agrees that the claims against DynCorp must be dismissed.[1]

Against the remaining Defendants, Plaintiff has alleged claims under three provisions of the FCA, which, as pertinent here, imposes liability on any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; and (3) "conspires to commit a violation of [the other provisions of the FCA]." 31 U.S.C. § 3729(a)(1)(A)–(C). Plaintiff alleges that Defendants' alleged price sharing, bid rigging, and subcontract stacking violate these provisions.

---

[1] In contrast, Amentum and URS do not contend that by referring to Amentum and URS interchangeably, Plaintiff improperly conflates their conduct, so this Court will similarly analyze their conduct collectively.

To state a claim under the FCA, a plaintiff must allege that (1) "there was a false statement or fraudulent course of conduct"; (2) "that was material"; (3) "that caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')"; and (4) that was "made or carried out with the requisite scienter." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 188 (4th Cir. 2022) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999). This Court will address each element in turn.

### i.    Falsity

A plaintiff may plead falsity by alleging that the defendant either explicitly or implicitly falsely certified compliance with conditions of payment. *United States ex rel. Jefferson v. Roche Holding AG*, 489 F. Supp. 3d 418, 432 (D. Md. 2020). A defendant does so explicitly when "a government contract or program required compliance with certain conditions as a prerequisite to a government benefit, payment, or program; the defendant failed to comply with those conditions; and the defendant falsely certified that it had complied with the conditions in order to induce the government benefit." *Harrison*, 176 F.3d at 786.

Plaintiff alleges one theory of explicit false certification. Specifically, he alleges that Amentum falsely certified compliance with DFARS 252.215-7010(b)(1)(ii), which requires submission of "information that is adequate for determining commerciality and evaluating the reasonableness of the price." Plaintiff contends that the information that Amentum submitted pursuant to this requirement must have been false because the alleged bid rigging and price sharing rendered the price of the items supplied unreasonable, but he does not allege specifically what information Amentum submitted. This theory requires explicit certification, and without knowing what Amentum explicitly certified, this Court cannot assess whether that certification was false. Plaintiff has therefore failed to allege an express false certification.

A plaintiff may also plead falsity under an implied false certification theory, a theory that the Supreme Court examined in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016). There, the respondents and the government had argued that all claims for payment implicitly represent that the claimant is legally entitled to payment such that failure to disclose noncompliance with material legal requirements renders the claim misleading and thus actionable. *Id.* at 188. The Court determined that "it need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment" and concluded that the implied false certification theory supports liability "at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 188–89.

Following its decision in *Escobar*, the Supreme Court vacated the Fourth Circuit's decision in another case involving implied false certification and remanded the case to the Fourth Circuit for further consideration in light of *Escobar*. *See Triple Canopy, Inc. v. United States ex rel. Badr*, 579 U.S. 924 (2016). On remand, the Fourth Circuit engaged in the *Escobar* analysis and concluded that the relevant claims were viable, but it also noted that "to the extent [*Escobar*] left open the question of whether 'all claims for payment implicitly represent that the billing party is legally entitled to payment,'" it had already answered that question in its earlier decision by concluding that allegations that a defendant requested payment under a contract and "withheld information about its noncompliance with material contractual requirements" suffices to plead falsity. *United States ex rel. Badr v. Triple Canopy, Inc.*, 857 F.3d 174, 178 n.3 (4th Cir. 2017) (quoting *United States ex rel. Badr v. Triple Canopy, Inc.*, 775 F.3d 628, 636 (4th Cir. 2015)).

Here, Plaintiff has not alleged any specific representations made by Amentum in its requests to the government for payment, so he has not satisfied the *Escobar* standard. Thus, the falsity prong appears to turn on whether a plaintiff *must* satisfy the *Escobar* standard to plead implied false certification, or whether the standard described in *Triple Canopy*, which does not require that specific representations accompany a request for payment, remains viable. The Supreme Court in *Escobar* explicitly stated that it was not deciding whether all claims for payment implicitly represent entitlement to payment and specified that an implied false certification theory supports liability "*at least* where" certain requirements are met. Thus, the Court did not foreclose any other implied false certification theory. Furthermore, although the Fourth Circuit applied the *Escobar* standard on remand in *Triple Canopy*, it also recognized the question left unresolved in *Escobar* and suggested that its earlier decision had answered it by requiring only a request for payment under a contract and nondisclosure of noncompliance with material contractual terms.

Defendants cite several cases dismissing claims for failure to satisfy the *Escobar* standard, but, with one exception, those cases all assume without any analysis that the *Escobar* standard constitutes the only way to plead implied false certification. In fact, in one case, the court quoted the *Escobar* standard but omitted the "at least where" language that the Supreme Court used to introduce the standard and replaced it with "only where." *See United States ex rel. Potter v. CASA de Md.*, Civ. No. PX–16–0475, 2018 WL 1183659, at *4 (D. Md. Mar. 6, 2018). In the one case that does examine this issue, the Ninth Circuit noted that prior decisions by other panels had applied only *Escobar*'s standard and had not considered whether the implied false certification claims in those cases had satisfied a lower standard articulated in a Ninth Circuit case predating *Escobar*. *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1018 (9th Cir. 2018). The Ninth Circuit reasoned that although it was bound by those decisions of the prior panels, if it were

analyzing *Escobar* as a matter of first impression, it likely would not conclude that *Escobar* invalidated the preexisting lower standard because the Supreme Court had not concluded that its standard constituted the only way to plead implied false certification. *Id.*

This Court similarly concludes that the plain language of the Supreme Court's *Escobar* decision makes clear that its standard constitutes one way, but not the only way, to plead implied false certification. Other ways, like the preexisting lower standard described in *Triple Canopy*, remain viable. The Fourth Circuit's discussion of this question in *Triple Canopy* suggests that it would likely reach the same conclusion in a case like this one. Accordingly, this Court must consider whether Plaintiff has alleged a request for payment under a contract without disclosing noncompliance with material contractual requirements.

Plaintiff has alleged requests for payment pursuant to a contract, the AFCAP V. He has offered five provisions under his implied false certification theory that he contends Defendants violated: (1) the Sherman Antitrust Act, (2) the standard Amentum subcontract agreement, (3) FAR 52.203-13, (4) FAR 52.203-7, and (5) FAR 52.244-5. Each of these FAR provisions was incorporated into the AFCAP V, so they may support an implied false certification theory under the *Triple Canopy* standard. In contrast, neither the Sherman Antitrust Act nor the standard Amentum subcontract agreement was part of the AFCAP V, so they cannot support an implied false certification theory. A violation of a criminal provision of the Sherman Antitrust Act could, however, form the basis for a violation of FAR 52.203-13, which requires, as pertinent here, that prime contractors have a written code of business ethics and conduct and disclose to the government credible evidence of violations of certain federal criminal provisions pertaining to fraud or the FCA. Plaintiff acknowledges that Amentum had a written code of business ethics, even if, according to him, Amentum did not abide by it. However, he has also alleged that

Amentum never disclosed any violations under FAR 52.203-13. Thus, to the extent that Plaintiff has sufficiently alleged an underlying violation of the criminal code pertaining to fraud, such as the Sherman Antitrust Act, or the FCA, he has alleged a violation of FAR 52.203-13.

Regarding his subcontract stacking allegations, Plaintiff has sufficiently alleged noncompliance with both FAR 52.244-5 and FAR 52.203-7. FAR 52.244-5 requires that the prime contractor select subcontractors on a competitive basis, and Plaintiff has alleged that Amentum did not do so because it sometimes chose to buy from a reselling subcontractor at a higher price rather than from another subcontractor directly at a lower price. FAR 52.203-7, in turn, prohibits the inclusion of a kickback amount in a claim to a prime contractor or to the government. Plaintiff has alleged noncompliance with this provision by alleging that that difference in price functions as a kickback to the reselling subcontractor.

Regarding his bid rigging and price sharing allegations, although Plaintiff made detailed allegations that Amentum shared subcontractor prices with other subcontractors and encouraged subcontractors to submit sham bids, it is not clear that those practices led Amentum to ultimately select bids on an uncompetitive basis. Representatives of both Freedom Air and Dallas Aviation indicated that they submit bids that they know are too high and will not be successful. The Dallas Aviation representative specifically stated Dallas Aviation sometimes submits high bids even though Amentum chooses the lowest, because Amentum needs a certain number of bids from which to choose. These allegations leave open the possibility that, notwithstanding the bid rigging and price sharing, Amentum still selected bids by subcontractors uninvolved in this scheme. In fact, Plaintiff has alleged that Suppliest, a party uninvolved in this scheme, won sixteen bids. This alleged practice was uncompetitive in the sense that independent bidding may have resulted in the submission of even lower bids. However, it is not clear that by engaging in this practice, Amentum

failed to select a subcontractor on a "competitive basis" as required by FAR 52.244-5 if Amentum still selected the lowest, and independent, bid. Nor is it clear how any party would have received a kickback in violation of FAR 52.203-7 under these circumstances. Ultimately, though, this Court need not decide whether the alleged bid rigging and price sharing violated these contractual terms, or a criminal provision of the Sherman Antitrust Act such that failure to disclose the conduct violated FAR 52.203-13. Even if a violation occurred, Plaintiff has failed to show that such a violation based on the alleged price sharing and bid rigging was material.

### ii.    Materiality

Materiality under the FCA turns on the misrepresentation's effect on the government's likely or actual behavior. *Escobar*, 579 U.S. at 193. The Supreme Court has delineated several factors relevant to whether a violation is material, a standard it has described as "demanding." *Id.* at 194–95. These factors include whether the government has expressly identified a provision as a condition of payment, whether the government would have the option to decline payment if it knew of the noncompliance, whether the defendant knows that the government consistently refuses to pay claims based on noncompliance with the particular provision, and whether the noncompliance is "minor or insubstantial." *Id.* No one factor is dispositive. *Id.*

The Fourth Circuit has also considered "common sense" and a defendant's own actions in covering up noncompliance. *See Triple Canopy*, 857 F.3d at 178. In *Triple Canopy*, the defendant had supplied guards for a base in a combat zone who had not passed a required marksmanship course. *Id.* at 175. The court concluded that this noncompliance was material because the defendant had falsified scorecards to hide the noncompliance and it took only "common sense" to recognize the importance of a requirement that guards in a combat zone be able to "shoot straight." *Id.* at 175, 178–79.

Regarding Plaintiff's subcontract stacking allegations, this Court concludes that he has satisfied the materiality requirement. Although the complaint does not allege that the government expressly identified FAR 52.203-7 as a condition of payment, that provision expressly authorizes the government to offset the amount of a kickback against any amount owed to a contractor. Furthermore, the complaint describes an FCA lawsuit in which the government intervened and settled that involved allegations of a similar subcontract stacking scheme to that alleged here, an indication that the government views this kind of conduct as important to its decision to pay a claim rather than only "minor or insubstantial." Finally, this Court exercises its "common sense" to conclude that the government would consider it material that the subcontract stacking scheme led Amentum to charge it a higher price for the same items that it could have received, and absent the subcontract stacking did receive, at a lower price.

This Court cannot reach the same conclusion regarding the price sharing and bid rigging allegations, however. Plaintiff has not alleged that the government explicitly identified any related provision as a condition of payment or that the government would have the option to decline payment based on this conduct. Although Plaintiff offers some evidence that the government considers price sharing and bid rigging generally to be important to its decision to pay, this Court cannot conclude that it would under the particular circumstances alleged here. As explained above, the complaint suggests that Amentum directed subcontractors to place high bids to meet Amentum's requisite number of quotes, but that Amentum still chose the lowest bid. On the occasions where the complaint identifies who placed the lowest bid and was awarded the subcontract, the awardee was Suppliest, a party uninvolved in the scheme. Thus, the complaint suggests that when Defendants engaged in price sharing and bid rigging, Amentum still charged the government based on the bid that was the lowest received, was arrived at independently, and

presumably reflected market price. Under these circumstances, this Court must conclude that the price sharing and bid rigging allegations do not meet the "demanding" materiality standard, so those theories cannot support Plaintiff's claims.

### iii.    Presentment

As for the subcontract stacking allegations, this Court now turns to the question of presentment. The FCA attaches liability to a claim for payment, rather than to the fraudulent conduct underlying the claim, so the "central question" in FCA cases is whether the defendant presented a claim for payment to the government. *Harrison*, 176 F.3d at 785. Accordingly, Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 456–57 (4th Cir. 2013). Instead, the plaintiff must plead presentment in one of two ways. *United States ex rel. Wheeler v. Acadia Healthcare Co.*, 127 F.4th 472, 491 (4th Cir. 2025). The plaintiff can allege "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* (quoting *Nathan*, 707 F.3d at 455–56). Courts often refer to these facts as the "who, what, when, where, and how." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 384 (5th Cir. 2003)). Alternatively, the plaintiff can allege "that the defendant's fraudulent conduct necessarily led to the plausible inference that false claims were submitted to the government." *Wheeler*, 127 F.4th at 491.

Plaintiff has not alleged the time or place of any claim with particularity, so he must rely on the second approach. The second approach does not require a plaintiff to "produce documentation or invoices at the outset of the suit." *Grant*, 912 F.3d at 199. The plaintiff must, however, "connect the dots, even if unsupported by precise documentation, between the alleged false claims and government payment." *Id.* Allegations regarding the details of a scheme to submit false claims paired with "reliable indicia that lead to a strong inference that claims were actually submitted" suffice to plead presentment. *Wheeler*, 127 F.4th at 493 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

A review of similar cases is instructive. In *United States ex rel. Grant v. United Airlines, Inc.*, the plaintiff alleged that the defendant company, which was three subcontracting levels removed from the government, had routinely certified that it had performed repairs that it had not in fact performed. 912 F.3d at 198. The plaintiff made no allegations regarding the process to bill the government. *Id.* at 199. The Fourth Circuit concluded that the plaintiff had failed to allege presentment, explaining that the attenuation between the defendant and the government increased the possibility that a bill was never actually presented to the government. *Id.* at 198. It further reasoned that without any allegations regarding the billing process, "for instance, that upon information and belief, bills are routinely sent to the government upon completion of repairs and are routinely paid as presented," the complaint failed to connect the alleged fraudulent scheme to any paid claim. *Id.* at 199. In so concluding, the court distinguished cases involving prime contractor defendants and explanations of billing structures. *Id.* at 198.

In *United States ex rel. Wheeler v. Acadia Healthcare Co.*, the plaintiff provided detailed descriptions of both false treatment notes corresponding to fictitious therapy sessions and reimbursement under several government programs. 127 F.4th at 493. The Fourth Circuit

concluded that "[t]here can be little doubt that, if [defendant] created these false notes, it billed for those services" because it would "stretch the imagination" to create such false records but then deviate from the regular billing process, resulting in fictious sessions that were recorded but never billed. *Id.* (quoting *Grubbs*, 565 F.3d at 192). The court also emphasized how these facts differed from those in *Grant* because the defendant contracted directly with the government and the plaintiff provided a detailed explanation of the reimbursement process. *Id.*

Here, Plaintiff has sufficiently pled presentment as to Amentum, URS, and Dallas Aviation. First, he has alleged the details of a subcontract stacking scheme. The Dallas Aviation representative acknowledged that Amentum had directed Dallas Aviation to request a quote for raincoats using the unique codes from the Suppliest price index, which Amentum had shared with Dallas Aviation. Amentum authorized Suppliest to sell to Dallas Aviation at that index price, Suppliest did so, and Dallas Aviation then sold youth raincoats to Amentum at a higher price during the same month that Suppliest had sold the same youth raincoats to Amentum directly at a lower price. The Dallas Aviation representative revealed that this practice, whereby Amentum engaged an intermediary vendor when it was already purchasing items from a different vendor directly, was routine. The representative specified that Amentum regularly uses Dallas Aviation as a "reseller" for items, such as toilet paper, unrelated to Dallas Aviation's primary business of aviation supplies and services.

Second, Plaintiff has paired the description of this scheme with "reliable indicia" that claims arising out of the scheme were presented to the government. Plaintiff has provided allegations describing the billing process, specifically that subcontractors billed Amentum through purchase orders and Amentum then billed the government through invoices or vouchers on a cost-plus-fixed-fee basis for its allowable costs. Plaintiff has also alleged, consistent with *Grant*, that

on information and belief, Amentum routinely submitted claims based on these purchases, and the government routinely paid them as presented. Furthermore, like the defendant in *Wheeler*, and unlike the defendant three levels removed from the government in *Grant*, Amentum was in a direct contractual relationship with the government. It would "stretch the imagination" to believe that Amentum was directing this scheme to engage an unnecessary "reseller" to purchase items at a higher price, providing those items to the government, but then not billing the government for the items.

Plaintiff has not sufficiently pled presentment as to TD Supply or Freedom Air, however. The allegations regarding TD Supply and Freedom Air are similar to those regarding Dallas Aviation in that Amentum had provided them with the price index and TD Supply and Freedom Air attempted to resell items on the index to Amentum. Although these allegations provide additional evidence that subcontract stacking is a routine practice for Amentum, nothing suggests that it was a routine practice for TD Supply or Freedom Air. Instead, TD Supply's and Freedom Air's conduct could have constituted a one-time occurrence that, in neither case, was successful or resulted in presentment of a claim to the government. Accordingly, TD Supply's and Freedom Air's motions to dismiss will be granted.

### iv.    Scienter

Finally, this Court considers whether Amentum, URS, and Dallas Aviation acted with the requisite scienter. As noted above, state of mind, including knowledge, may be alleged generally under Rule 9(b), but a plaintiff must still allege specific facts that raise an inference of fraud. *Wilson*, 525 F.3d at 379. Knowledge constitutes the requisite scienter under the FCA. 31 U.S.C. § 3729(a)(1)(A)–(B). A person acts "knowingly" with respect to information under the FCA if he (1) "has actual knowledge of the information," (2) "acts in deliberate ignorance of the truth or

falsity of the information," or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The FCA does not require proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1)(B).

Plaintiff has adequately pled that Amentum and URS acted with the requisite scienter because he has alleged that they directed the subcontract stacking scheme. They knew the terms of their contract with the government and knew that they used Dallas Aviation as a reseller when they could, and sometimes did, buy the same items directly from another subcontractor, such as Suppliest. Dallas Aviation similarly knew that Amentum and URS used it as a reseller because its representative told Plaintiff that fact. Furthermore, the "AFCAP 5 Prime Contract Flow Downs" that applied to Amentum subcontracts included FAR 52.203-7, which prohibits kickbacks, so Dallas Aviation knew that that provision applied to Amentum's contract with the government. Plaintiff has thus sufficiently pled scienter as to Amentum, URS, and Dallas Aviation.

Accordingly, this Court concludes that Plaintiff has satisfied each requirement to state claims for underlying FCA violations based on subcontract stacking as to Amentum, URS, and Dallas Aviation but has failed to do so as to TD Supply and Freedom Air and as to violations based on price sharing and bid rigging.

### v. Conspiracy

Defendants additionally argue that even if Plaintiff has sufficiently pled an underlying FCA claim, he has failed to plead conspiracy. The ordinary principles of civil conspiracy apply to an FCA conspiracy claim. *United States ex rel. Hedley v. Abhe & Svoboda, Inc.*, 199 F. Supp. 3d 945, 956 (D. Md. 2016). A plaintiff must allege an agreement to violate the FCA and at least one act in furtherance of that agreement. *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 501 (D.S.C. 2016); *see also United States ex rel. Day v. Boeing*, 777 F. Supp. 3d 553, 597

(E.D. Va. 2025) (applying this standard and finding no facts that defendants had entered an agreement with each other or acts in furtherance of any agreement).

Plaintiff has alleged an agreement, disclosed by the Dallas Aviation representative, between Dallas Aviation, Amentum, and URS for Dallas Aviation to act as a reseller of products unrelated to its ordinary business when Amentum could buy those products at a lower price from another subcontractor directly. Amentum and URS engaged in acts in furtherance of this agreement when they directed Dallas Aviation to purchase raincoats from Suppliest and then purchased those raincoats from Dallas Aviation at a higher price than they had purchased the same kind of raincoats directly from Suppliest. Dallas Aviation engaged in an act in furtherance of the agreement when it sold those raincoats at a higher price to Amentum and URS. Plaintiff has thus sufficiently pled a conspiracy claim as to Dallas Aviation, Amentum, and URS.

Defendants' arguments regarding this claim are unavailing. Defendants primarily argue that FCA conspiracy requires purpose to defraud, citing *United States ex rel. Ahumada v. NISH*, 756 F.3d 268 (4th Cir. 2014). But that case relied, in turn, on *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008), a case decided before the FCA was amended in 2009. *See Ahumada*, 756 F.3d at 282. The then-operative version of the FCA imposed liability on a person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3) (2008). The *Allison Engine* Court interpreted this language to require intent to defraud the government. *Allison Engine*, 553 U.S. at 672–73. Following the 2009 amendment, however, that subsection now imposes liability on a person who "conspires to commit a violation of [the other provisions of the FCA]." 31 U.S.C. § 3729(a)(1)(C). In applying *Allison Engine*, the *Ahumada* Court quoted language that the 2009 amendment removed from the statute. *Ahumada*, 756 F.3d at 282; *see also United States ex rel. Cannon v. Rescare, Inc.*, Civ. No. 09–3068, 2014

WL 4638715, at *4 (E.D. Pa. Sept. 16, 2014) (noting that the 2009 amendment removed the requirement that a plaintiff prove intent to defraud the government). Seeing no indication within the current version of the statute that conspiracy requires intent to defraud, particularly in light of Congress's decision to remove the language that led the Supreme Court to construe such a requirement, this Court concludes that a plaintiff need not plead intent to defraud.

Defendants further argue that *Ahumada* requires that a plaintiff plead particular details regarding the agreement to violate the FCA. The Fourth Circuit dismissed the conspiracy claim in that case in part because the plaintiff had failed to identify who at the defendant company entered the agreement, when that person did so, and what the defendant company sought to gain from the agreement. *Ahumada*, 756 F.3d at 282. However, the court discussed these requirements as to the conspiracy claim immediately after analyzing the underlying FCA claims, and the requirements track the standard that it cited for presentment, namely that the plaintiff must allege the time of a misrepresentation, the identify of the person making it, and what he obtained because of it, or the "who, what, when, where, and how" standard. *Id.* at 280–82; *see also United States ex rel. Van Voris v. GenPhar, Inc.*, C/A No. 2:09-CV-0005-RMG-KDW, 2016 WL 11257426, at *8 (D.S.C. Oct. 5, 2016) (applying the "who, what, when, where, and how" standard in its conspiracy analysis). As explained above, those requirements apply to one method of pleading presentment, but not the only one. Plaintiff has used the other method here, and it would make little sense to impose those requirements to plead conspiracy when he did not have to satisfy them to plead the underlying violation. Thus, this Court is unpersuaded that the conspiracy analysis in *Ahumada* applies in a case, like this one, that does not involve that method of pleading presentment. The motions to dismiss the conspiracy counts will be denied as to Amentum, URS, and Dallas Aviation.

### D. Constitutionality

Having concluded that Plaintiff has sufficiently pled claims against Amentum, URS, and Dallas Aviation, this Court must now address the arguments advanced by those Defendants that the *qui tam* provisions of the FCA are unconstitutional. "The [FCA] is unusual in authorizing private parties—known as relators—to sue on the Government's behalf." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 423 (2023). The *qui tam* provisions of the FCA authorize this scheme by effectuating a partial assignment of the government's claim for damages to the relator. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000). Defendants argue that these provisions violate the Appointments Clause, the Take Care Clause, and the Vesting Clause.

The Fourth Circuit has never addressed these questions, but every court of appeals that has done so has upheld the validity of the *qui tam* provisions. *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 807 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 758 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1042 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993). It appears that only one district court has disagreed. *See United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293, 1322 (M.D. Fla. 2024); *United States ex rel. Gose v. Native Am. Servs. Corp.*, No. 8:16-cv-03411-KKM-AEP, 2025 WL 1531137, at *1 (M.D. Fla. May 29, 2025).

### i. Appointments Clause

Defendants first argue that the *qui tam* provisions violate the Appointments Clause, which requires that "Officers of the United States" be appointed by the President, a court, or a department head. U.S. Const. art. II, § 2, cl. 2. The Supreme Court has delineated two requirements that

distinguish "Officers of the United States" from "mere employees." *Lucia v. SEC*, 585 U.S. 237, 245 (2018). First, an officer "must occupy a 'continuing' position established by law" such that he exercises duties that are "continuing and permanent" rather than "occasional or temporary." *Id.* (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879)). Second, an officer must exercise "significant authority pursuant to the laws of the United States." *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)). Defendants argue that FCA relators meet both requirements and are therefore officers of the United States who must be appointed pursuant to the Appointments Clause, rather than exercising "self-appointment" by filing an FCA suit.

The parties focus their arguments on the first requirement, whether an FCA relator occupies a continuing position established by law. Individuals who perform only brief, ad hoc duties do not constitute officers. *See Germaine*, 99 U.S. at 511–12 (concluding that a civil surgeon who examined pensioners only when called upon did not constitute an officer because his duties were only intermittent); *see also Auffmordt v. Hedden*, 137 U.S. 310, 326–27 (1890) (concluding that a merchant appraiser "selected as an emergency arises" to perform reappraisals of importations did not constitute an officer). However, a person who exercises duties limited to a single case may still constitute an officer. *See Morrison v. Olson*, 487 U.S. 654, 664, 671 n.12 (1988) (concluding that it was "clear" that an independent counsel acted as an officer even though her office terminated upon completion of an investigation or prosecution). Thus, the fact that an FCA relator's duties are limited to a single lawsuit does not necessarily preclude him from acting as an officer while litigating that case.

However, a continuing position also entails "duties [that] continue, though the person be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747)

(Marshall, C.J.). Thus, an office "must not depend on the identity of the person occupying it." *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022).

The government and plaintiff persuasively argue that the position of an FCA relator is a personal one, such that it cannot constitute an office. The FCA itself provides that a "private person[]," or relator, who brings an FCA action does so both "for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). The relator himself therefore has an interest in the action. *Stevens*, 529 U.S. at 772. If a relator can no longer continue the action, an unrelated person does not substitute into that position. Rather, the individual who holds the relator's personal interest in the action substitutes into the position. *See United States ex rel. Neher v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993) (concluding that personal representative of relator's estate substituted into FCA action following relator's death); *see also United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 362, 364 (5th Cir. 2014) (concluding that bankruptcy trustee, as the real party in interest as to claims within bankruptcy estate, became new relator following bankruptcy of original relator).

Defendants note that if an FCA action is dismissed without prejudice, a new relator may bring a new FCA action based on the same underlying alleged conduct, and they argue that this scenario demonstrates that the position of relator is not personal. But even if based on the same underlying alleged conduct, the new action is legally unrelated to the initial action, so it is difficult to perceive the "position" held by the new relator as the same as that held by the previous one. Furthermore, nothing compels an unrelated relator to bring a new action in this scenario, so it is difficult to perceive such a position as "continuing" from one unrelated relator to the next

For these reasons, this Court concludes that the position of FCA relator is a personal one that depends on the identity of the person holding it. Thus, it is not an "office" or continuing

position established by law that would render its holder an officer of the United States. This Court therefore concludes that an FCA relator need not be appointed according to the procedures contained in the Appointments Clause.

### ii.    Take Care Clause and Vesting Clause

Defendants also argue that the FCA *qui tam* provisions violate the Take Care Clause and the Vesting Clause. The Take Care Clause requires the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 2, and the Vesting Clause provides that the "executive Power shall be vested in a President of the United States of America," U.S. Const. art. II, § 1, cl. 1. Defendants argue that the *qui tam* provisions allow relators to exercise executive power that is vested in the President, without adequate supervision by the President to ensure he takes care that the laws be faithfully executed.

The government and plaintiff acknowledge that FCA relators exercise authority to enforce laws quite unlike that of plaintiffs suing under other laws to redress private injuries. They argue, however, that the President retains sufficient control over FCA relators and that the history of laws authorizing *qui tam* actions suggests that such actions comport with the Constitution.

In *Morrison v. Olson*, the Supreme Court considered whether the President retained sufficient control over an independent counsel. The Court concluded that the Attorney General and, through him, the President, exercised sufficient control over the independent counsel because he could remove the independent counsel for good cause, his specific request was required to appoint an independent counsel, the facts submitted by him limited the independent counsel's jurisdiction, and the independent counsel had to abide by Justice Department policy. *Morrison*, 487 U.S. at 695–96. The *Morrison* Court twice stated that the proper inquiry was whether the statute authorizing the independent counsel "taken as a whole" unduly interfered with the

President's constitutional role, so the proper inquiry regarding the FCA is not whether the exact facts considered by the *Morrison* Court are present but whether the FCA "as a whole" reserves sufficient control to the President. *Kelly*, 9 F.3d at 752 (quoting *Morrison*, 487 U.S. at 685, 693).

This Court concludes that the President, through the Attorney General, retains sufficient control over an FCA relator. An FCA complaint must be filed under seal and remains under seal for an initial period during which the government must investigate the allegations and determine whether it will intervene and conduct the litigation. 31 U.S.C. § 3730(b)(2)–(4). Even if it does not intervene during this initial period, the government may intervene at any time during the litigation for good cause. 31 U.S.C. § 3730(c)(3). Furthermore, the government may dismiss the action or settle the action over the relator's objection, whereas the relator may not dismiss (or, by extension, settle) the action without the written consent of the Attorney General. 31 U.S.C. § 3730(b)(1), (c)(2)(A)–(B). The government may also seek a stay of discovery in the action regardless of whether it intervenes. 31 U.S.C. § 3730(c)(4). Thus, although the government lacks control over commencement of an FCA action, the government retains significant authority to control and, if it chooses, end an action once it has commenced. *See Kelly*, 9 F.3d at 755 (concluding that the Executive Branch exercises at least an equivalent degree of control over FCA relators as it does over independent counsels).

Furthermore, this Court agrees with the government and Plaintiff that the history of *qui tam* actions suggests that such actions comport with the Constitution. Although historical patterns alone cannot justify constitutional violations, "[a]n act 'passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, . . . is contemporaneous and weighty evidence of its true meaning." *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (quoting *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888)). In *Vermont Agency*

*of Natural Resources v. United States ex rel. Stevens*, the Supreme Court described the history of *qui tam* actions, noting that immediately after the framing, the First Congress enacted several "informer statutes" that provided both a bounty and an express cause of action. 529 U.S. at 776–77. The Court viewed this evidence as "well nigh conclusive" in determining that the *qui tam* provisions of the FCA did not violate Article III's standing requirement. *Id.* at 777. The Court also explicitly stated that it "express[ed] no view" regarding whether those provisions violate Article II's Appointments Clause or Take Care Clause, which were not at issue in that case. *Id.* at 778 n.8.

Consistent with *Marsh* and *Stevens*, this Court views these laws enacted by the First Congress as "weighty evidence" of the Constitution's meaning that the Framers did not intend to prohibit causes of action whereby private persons could bring suit on behalf of the government. Although the *Stevens* Court expressed no view on the Article II question, the same reasoning applies here. *See Riley*, 252 F.3d at 752 ("[I]t is logically inescapable that the same history that was conclusive on the Article III question in *Stevens* with respect to *qui tam* lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question concerning this statute."). For these reasons, this Court also concludes that the FCA's *qui tam* provisions do not violate the Take Care Clause or the Vesting Clause.

## IV.   CONCLUSION

For the reasons stated above, this Court will (1) grant The Anti-Fraud Coalition's motion for leave to file an amicus brief, ECF 78; (2) deny Plaintiff's cross-motion for an extension of time to file his amended complaint *nunc pro tunc*, ECF 76; (3) grant TD Supply's and Freedom Air's motions to dismiss, ECF 67, 70; (4) grant Amentum's, URS's, and DynCorp's motion to dismiss, ECF 66, as to DynCorp and the price sharing and bid rigging allegations but deny it as to Amentum and URS and the subcontract stacking allegations; and (5) grant Dallas Aviation's motion to

dismiss, ECF 71, as to the price sharing and bid rigging allegations but deny it as to the subcontract stacking allegations. Accordingly, DynCorp, TD Supply, and Freedom Air will be dismissed from this action. A separate Order follows.

Dated: November 19, 2025

_____/s/_____
Stephanie A. Gallagher
United States District Judge